NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**GAVIN W. BRUCE, OSB #113384**
Assistant United States Attorney
Gavin.Bruce@usdoj.gov
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
**CAMERON A. BELL, CSB #305872**
Trial Attorney—Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Cameron.Bell@usdoj.gov
Telephone: (202) 802-7643
Attorneys for the United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**ADAM BRAUN,**

**Defendant.**

**6:24-mj-00039-MK**

**UNITED STATES' DETENTION MEMORANDUM**

Defendant Adam Braun targeted and terrorized the community at Temple Beth Israel (TBI) over the course of five months. In that time, Mr. Braun's actions escalated. At first, he tagged his moniker and veiled white supremacist symbols on the synagogue's walls. Mr. Braun's final act included traveling—at night and during an ice storm—to TBI's preschool, armed with a hammer. Though he did not break the glass of the preschool's doors, Mr. Braun eventually spray painted "White Power" on the side of the building. A search of his home

uncovered a trove of memorabilia affiliated with the Ku Klux Klan (KKK) and Nazis, as well as numerous knives. And even after he was arrested and charged by the state, and directed by his release conditions to stay away from TBI, he has ignored those conditions and has continued to interact with and harass TBI congregants online.

Mr. Braun's extensive collection of KKK and Nazi materials and weapons, along with his escalating actions and his strongly-held white supremacist beliefs, reflect his danger to the community. Additionally, his limited ties to the District of Oregon and history of absconding and failing to appear underscore a risk of non-appearance. He should remain detained.

## BACKGROUND

### A. *Graffiti Attacks at TBI*

Starting in at least August 2023, Adam Braun began targeting Temple Beth Israel, the largest Jewish congregation in Eugene, with repeated graffiti attacks. The first incident was discovered on August 20, 2023.

Though this graffiti seemingly lacks a connection to antisemitic ideology, in fact the number "23," featured in the lower-right hand corner, is used by white supremacists, particularly

common on the West Coast, as a substitute for the longer symbol "23/16," which is shorthand for W/P or "White Power."

Mr. Braun's next attack was discovered on or about September 11, 2023. On that day, individuals affiliated with TBI discovered the numbers "1377" spray-painted on the exterior wall of TBI.

Mr. Braun later explained that the graffiti was a "play on that '1488' shit." The numeric "1488" is a popular white supremacist symbol. The first symbol, "14," is shorthand for the "14 Words" slogan: "We must secure the existence of our people and a future for white children." The second, "88," stands for "Heil Hitler" (H being the 8th letter of the alphabet).[1]

Mr. Braun's third graffiti attack at TBI occurred between the evening of October 6 and the morning of October 7—the very same day that Hamas attacked Israel, and (because of the time difference) likely after the Hamas's attack was occurring. This time, Mr. Braun tagged his moniker—"ANTBOI"—right over the paint that was being used to cover his previously graffiti: "1377."

---

[1] *See* https://www.adl.org/resources/hate-symbol/1488.



Mr. Braun's final attack on TBI was the most brazen and concerning. On the morning of January 14, 2024, during the middle of Eugene's epic ice storm, Mr. Braun travelled to TBI with a hammer. He approached the doors of TBI's preschool—a preschool that cares for nearly 50 young children Monday through Friday. As he approached the glass doors of the preschool, he covered his face and put the hood of his jacket over his head. He lifted his arm above his head, as if to use the hammer to smash the glass doors (pictured below).

Before striking the door, Mr. Braun noticed the security camera. He stared into the camera and appeared to make statements into the camera for approximately one minute before walking away. A video of the incident is provided under seal as Exhibit 1.






Ten minutes later, Mr. Braun reappeared near the parking lot at TBI. He approached the wall of the building near the bicycle racks, the same wall where he previously tagged his moniker and "1377," and scrawled the following:



**B. *Evidence Obtained Following State Arrest***

Mr. Braun was arrested on state charges on January 31, 2024. During an interview following his arrest, he expressed his concern, discontent, and general disapproval of the Jewish community on multiple occasions. He repeated several antisemitic tropes; he claimed Jewish people and "Zionists" possessed "a lot of influence over the nerve centers of society" and were overrepresented in positions of power. He indicated he was skeptical of the Holocaust, telling law enforcement that some things "just don't seem to add up." All the while, Mr. Braun claimed he did not intend to harm anyone at TBI.

While being interviewed, investigators searched Mr. Braun's home and found an extensive collection of white supremacist and Nazi paraphernalia. He possessed two full Ku Klux Klan robes – a white robe and a black robe. Black robes are typically worn by "Knighthawks"—rank officers whose main role is to act as security at KKK events.[2]

---

[2] *See, e.g.* https://nmaahc.si.edu/object/nmaahc_2011.144.2.1ab



Investigators also found, on the mantel in Mr. Braun's living room, framed photos of Adolf Hitler (with "88" written on the photo) and Heinrich Himmler, along with documents related to Nazi Germany, including "The Oath of the SS Man"; several books, including *Mein Kampf* and *The Hoax of the Twentieth Century* (referring to the Holocaust); and several pamphlets, including "What it means to be a Klansman" and "A Klansman's way of life."





88

**United States' Detention Memorandum**

**Page 8**



Der Reichsführer-SS
Tgb.Nr. AR/1377
4.

Berlin, den 2.7.1936.

1). SS-Obergruppenführer Weitzel
Düsseldorf, Neues Polizeipräsidium

Lieber Fritz !

Deinen Brief vom 30.4. mit den beiden Arbeiten habe ich erhalten. Ich erkenne mit Freuden an, dass Du in der Erziehung Deines Führerkorps auch auf diesem Gebiet vorbildlich bist. Die beiden beigelegten Arbeiten finde ich sehr gut.

Das Thema 4) bitte ich vielleicht abzusetzen, da es mir in dieser Fassung zu gefährlich erscheint. Ich schlage Dir anstatt dessen das Thema vor: Ist Gottesglaube und Konfession dasselbe ??

Heil Hitler !
Dein
gez. H.Himmler.

Eil!

Rasse- u. Siedlungs-Hauptamt SS
Nr. 7126 4. Jul. 1936

2). Über das Rasse- und Siedlungshauptamt
Berlin
an die
SS-Personalkanzlei
Berlin

durchschriftlich mit der Bitte um Kenntnisnahme. Der Brief des SS-Ogruf. Weitzel sowie die beiden Arbeiten werden zum Verbleib bei der SS-Personalkanzlei beigefügt.

Anl.

Der Reichsführer-SS

Copy of the original document which was held by the former Berlin Document Centre and dated 2.7.1936.

11

K
K K

Along with these items, investigators found the hammer Mr. Braun brought with him to TBI. Investigators also found large knives at Mr. Braun's property and in his car:

United States' Detention Memorandum

Page 9





**United States' Detention Memorandum**

**Page 10**

## APPLICABLE LAW

**A. Eligibility for Detention Hearing**

At the initial appearance, the court found, on its own motion, that this case involved both a serious risk that Mr. Braun will flee and a serious risk that Mr. Braun will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. ECF No. 8; *see* 18 U.S.C. § 3142(f)(2).

**B. Purpose of Detention Hearing**

Having determined that a hearing is required under 18 U.S.C. 3142(f)(2), the court's inquiry now turns to whether "any condition or combination of conditions set forth in subsection (c) of [18 U.S.C. 3142] will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. 3142(f). When a defendant is eligible for detention under 18 U.S.C. § 3142(f)(2)—because of his risk of flight or obstruction—rather than because of a qualifying § 3142(f)(1) charge, some courts have held that danger to the community falls out of detention analysis. *See, e.g.*, *United States v. Himler*, 797 F.2d 156 (3rd Cir. 1986); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (favorably citing *Himler* and *Ploof* without analysis).

The government disagrees. The plain text of the statute says otherwise. Once a detention hearing is triggered under either § 3142(f) provision, the statute asks the same question—can any set of release conditions ensure the defendant's appearance and the community's safety? 18 U.S.C. § 3142(e). The statute's text lines up with the purposes of the Bail Reform Act. *See United States v. Salerno*, 481 U.S. 739, 742 (1987) (explaining that the Act was passed, in part, to address "the alarming problem of crimes committed by persons on release").

But even those courts that follow the narrower reading seem to agree that when a defendant poses a serious risk of witness interference, he should not be released unless the court finds conditions sufficient to mitigate that risk. *See Himler*, 797 F.2d at 160 (disallowing detention based on danger where there was no "claim that [defendant] would attempt to obstruct justice or intimidate a witness or juror.").

**C. Standard and Burden**

The government bears the burden of proving by a preponderance of the evidence that a defendant is a flight risk; and community danger requires clear and convincing proof. *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Four factors help guide release decisions: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the nature and seriousness of the danger posed to the community; and (4) defendant's history and characteristics. 18 U.S.C. § 3142(g).

**D. Rules of Evidence Do Not Apply at a Detention Hearing**

The Federal Rules of Evidence do not apply in detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F. Supp. 2d 925, 925, 26 (N.D. Cal. 2007).

/ / /

/ / /

/ / /

/ / /

/ / /

## DISCUSSION

**A. Nature and Circumstances of the Offense and Weight of Evidence**

Mr. Braun's attacks have terrorized a community reeling from the recent exponential rise in antisemitism in the United States and in the world. The seriousness of his conduct, escalating from graffiti containing subliminal messages to him attempting to damage or break the door at TBI's preschool and spray-painting "White Power" on the side of the building—an explicit statement of white supremacy and a clear intent to physically harm the Jews who worship at TBI—is manifest and the weight of the evidence is substantial.

**B. Nature and Seriousness of the Danger Posed to the Community**

Mr. Braun poses a risk to the community. Though Mr. Braun, to date, has only caused property damage, the impact of his actions has been felt broadly by the TBI community, who fear what Mr. Braun might do next. Though Mr. Braun has yet to use any of his weapons against individual members at TBI, the Bail Reform Act's language regarding "danger to any person or the community" is not limited to danger of physical violence. *United States v. Isaacs*, 469 F. Supp. 3d 801, 804 (S.D. Ohio 2020). The concept of safety may include non-physical harm. *United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007); *see also* S. Rep. No. 225, 98th Cong., 2d. Sess. 12, 1984 U.S.C.C.A.N. 3182, 3195 ("The [Judiciary] Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In that regard, the harm to the community at TBI transcends the physical damage to the building, and Mr. Braun's release will pose a serious and continued risk to the community at TBI.

The sense of safety at the community has suffered greatly due to Mr. Braun's repeated, escalating attacks. In the days following the attack and before the state arrested Braun, TBI

invested in increased nighttime security, as well as an increased security presence during weekly events and religious holidays.  At least two significant Jewish holidays are approaching in the next several weeks: Purim and Passover.  TBI remains on full alert.  Releasing Mr. Braun would cause additional stress to the TBI community.

      This sense of unease and fear is exacerbated by the fact that, following Mr. Braun's state arrest, Mr. Braun used Facebook to harass the TBI community.  As the below illustrates, Mr. Braun is not remorseful about the conduct that led to his initial arrest.  Instead, it appears that Mr. Braun is determined to continue targeting and harassing members of TBI, simply because they are Jewish. This also highlights Mr. Braun's ability and willingness to threaten and intimidate potential witnesses, i.e., members of TBI.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



**C. Defendant's History and Characteristics**

Mr. Braun's criminal history, outlined in section (d) below, portrays an individual with numerous law enforcement contacts who continues to disregard his court obligations and ignore the consequences of his actions. And while the First Amendment provides Mr. Braun with

protection to hold, and even espouse, his own racist and antisemitic views, it does not provide protection for the crimes which he has committed.

Mr. Braun has yet to indicate any remorse for his actions; indeed, his own comments on Facebook suggest that he is proud of what he did. Additionally, while Mr. Braun was under no obligation to speak to law enforcement when interviewed at the time of his arrest, he elected to do so, and he described his antisemitic ideology and beliefs. Though he initially denied his involvement, he later confessed to his actions but explained (in his view) why his cause targeting Jews was righteous. Mr. Braun's beliefs that his conduct is justifiable, as well as his steps to conceal his criminal activity, underscore his potential to commit additional dangerous crimes targeting TBI or other Jews, if he is not detained.

Nothing in his history or his characteristics weighs in favor of release. He should be detained.

**D. Risk of Flight**

Mr. Braun has limited ties to the District of Oregon. He has no family in the state, rents his small house in Eugene, and obtains work through a temp agency.

Moreover, Mr. Braun's criminal history, as outlined by Pretrial Services, is alone sufficient to conclude that he poses a risk of nonappearance. From at least 2008 until 2017, he lived in Wyoming, where he engaged in repeated criminal activity and also consistently failed to appear for court dates or comply with court orders. In 2013, Mr. Braun had his bond revoked and converted to a fine due to his failure to appear. In 2016, he was convicted of fleeing and attempting to elude police, and he was sentenced to 60 days jail. In 2017, an information was filed and warrant issued on another eluding charge. He failed to appear at two bench trials. Warrants were issued in Wyoming, which remain active to this day. Later in 2017, he faced

charges related to drugs and carrying/wearing a concealed weapon. He failed to appear for his jury trial in that case and a warrant was issued, which remains active. Mr. Braun was also charged with Breach of Peace, and a warrant was issued in that case as well, after he failed to appear for his bench trial.

Mr. Braun then moved to California, where he continued to encounter law enforcement and continued to fail to make court appearances. He was convicted of felony vandalism and misdemeanor obstructing a public officer, sentenced to 6 months jail and 36 months of probation. He soon failed to appear and had his probation revoked. His probation was revoked a few more times in California, including one instance where he was arrested in Oregon and removed back to California. In January 2019, he was sentenced to 16 months in jail. Most recently, Mr. Braun committed the instant offenses while participating in a diversion program related to state charges for driving under the influence.

Ultimately, Mr. Braun's history with the justice system underscores his limited ties to Oregon and illustrates a willingness and ability to quickly flee upon being faced with potential consequences for his actions.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

Nothing in Adam Braun's history weighs in favor of release. To the contrary, his demonstrated history of flight is strong evidence that there is a great risk of flight in this case. Moreover, the risk he poses to the community is significant. These factors compel his continued detention pending trial.

Dated: March 11, 2024

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

*/s/ Gavin W. Bruce*
GAVIN W. BRUCE
Assistant United States Attorney

*/s/ Cameron A. Bell*
CAMERON A. BELL
Trial Attorney—Civil Rights Division